UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
---------------------------x
UNITED STATES OF AMERICA    :    Criminal Action No.:
                            :    1:26-mj-14/1:26-cr-35
    versus                  :
                            :    Wednesday, January 28, 2026
JORGE MANUEL ROMERO,        :    Alexandria, Virginia
                            :
            Defendant.      :    Pages 1-26
---------------------------x
```

        The above-entitled preliminary hearing was heard before the Honorable William E. Fitzpatrick, United States Magistrate Judge.

A P P E A R A N C E S:

FOR THE GOVERNMENT:    NICHOLAS PATTERSON, ESQUIRE
                       NICHOLAS BOLZMAN, ESQUIRE
                       OFFICE OF THE UNITED STATES ATTORNEY
                       2100 Jamieson Avenue
                       Alexandria, Virginia  22314
                       (703) 299-3700

FOR THE DEFENDANT:     MARK PETROVICH, ESQUIRE
                       PETROVICH & WALSH PLC
                       10605 Judicial Drive
                       Suite A-5
                       Fairfax, Virginia  22030
                       (703) 934-9191

TRANSCRIBER:           STEPHANIE M. AUSTIN, RPR, CRR
                       Transcriber
                       United States District Court
                       401 Courthouse Square
                       Alexandria, Virginia  22314
                       S.AustinReporting@gmail.com

        (TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)

Stephanie Austin, RPR, CRR USDC/EDVA

P R O C E E D I N G S

THE DEPUTY CLERK:  United States v. Jorge Manuel Romero, Case 1:26-mj-14.

MR. PATTERSON:  May it please the Court.  Nicholas Patterson and Nicholas Bolzman for the United States.

MR. PETROVICH:  Good afternoon, Your Honor.  Mark Petrovich here on behalf of Mr. Romero.

THE COURT:  All right.  Good afternoon, Mr. Petrovich.  All right.  Good afternoon, Mr. Romaro.

THE DEFENDANT:  Good afternoon.

THE COURT:  And Mr. Petrovich, do we need the services of an interpreter?

MR. PETROVICH:  No, sir.

THE COURT:  Okay.  All right.  All right.  So we're on for a preliminary hearing/detention hearing.  The witness has been previously sworn.

Mr. Petrovich, do you contest the admissibility of the affidavit in support of the criminal complaint?

MR. PETROVICH:  For the preliminary hearing, no objection, Your Honor.

THE COURT:  Okay.  And are you contesting identification?

MR. PETROVICH:  No, sir.

THE COURT:  All right.  All right.  Mr. Patterson, do you have anything else with respect to probable cause or

3

detention?

MR. PATTERSON:  Your Honor, nothing more for probable cause, but a few very quick questions regarding detention.

THE COURT:  Okay.

(Witness previously sworn.)

DIRECT EXAMINATION

BY MR. PATTERSON:

Q    Special Agent Meyers, were you the -- one of the special agents who arrested Mr. Romero?

A    I was.

Q    And where did you arrest Mr. Romero?

A    At Dulles Airport.

Q    And do you know what Mr. Romero was doing at Dulles airport?

A    He was about to board a plane to El Salvador.

Q    I couldn't hear the last part?

A    He was about to board a plane to El Salvador.

Q    Did he make any excited utterances to you when you arrested him?

A    At that moment, no, but subsequent to that, he did say that he basically was relieved that this was over.

Q    And did you --

THE COURT:  I'm sorry.  I just missed that.

THE WITNESS:  He was --

MR. PETROVICH:  I'm going to object anyway.  It's not

4

an excited utterance, and it's hearsay.

THE COURT:  The Rules of Evidence don't apply during the proceedings, so I'll go ahead and -- I take your point, Mr. Petrovich.

MR. PETROVICH:  Very well, Your Honor.

BY MR. PATTERSON:

Q    So could you repeat what he said to you?

A    That he was relieved that it was over.  That was actually subsequent to that, after we had come back from the bathroom and we were heading back into the room where we were getting his information.  Fingerprinting him, that sort of thing.

Q    And when he said he was relieved, did he indicate why he was relieved?

A    Not necessarily at that time, no.  He just said he was relieved that this was all over.

Q    Did he make any statements about knowing that he was under surveillance?

A    Yes.  So subsequent to that when we were in the room, we had -- we were about to Mirandize him and ask questions and mentioned that he knew that we were following him during -- presuming during our surveillances.

Q    And this is -- he knew this before he went to Dulles Airport to fly to El Salvador?

A    Yes.  Yes.  Of course.

Q    And did he then ask for an attorney?

5

A    Yes, he did.

Q    Did he ask any further questions after that?

A    No, he didn't.

Q    And do you know whether Mr. Romero has any family outside of the United States?

A    Yes, in El Salvador.

Q    And were you able to review recent travel by -- international travel by Mr. Romero?

A    Yes.  In his passport that he had on him.

Q    And what did you notice?

A    That he had been to several different countries outside of the United States.

Q    Did these countries include El Salvador?

A    They do, yes.

Q    Did they include Panama?

A    Yes.

Q    Did it include Colombia?

A    That's correct.

Q    Thank you.

    MR. PATTERSON:  Your Honor, I have no further questions.

    THE COURT:  Did you determine when he made the reservations or bought the ticket?

    THE WITNESS:  For El Salvador?

    THE COURT:  For El Salvador.

6

THE WITNESS:  We did not.  I don't recall if we did.

THE COURT:  All right.  Thank you.

Mr. Petrovich.

MR. PETROVICH:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PETROVICH:

Q    Good afternoon, Special agent.

A    Good afternoon, sir.

Q    I want to work off your affidavit a little bit with regard to the charge against Mr. Romaro.  I guess it's the charges against Mr. Romero.

You had testified earlier with regard to a CS, that's a confidential source?

A    That's correct.

Q    Okay.  And you had said that -- in your affidavit in paragraph 7, you said that the CS has been paid three times for rental-related assistance and has no criminal -- oh, let me stop there.  For rental-related assistance.

What does that mean exactly?

A    Basically they were -- well, not reimbursed.  They were paid because they could not -- they're not getting paid at their current job because they don't have, as far as they know, status in the country.  They're in deferred action right now.

Q    So rental assistance means exactly -- rental for a residence, is that what it is?

7

Stephanie Austin, RPR, CRR USDC/EDVA

A    Yeah.  Payment for rent.  For the rent.

Q    For rent.  Okay?

A    Yes.

Q    You said three times.  How much money was that?

A    So to be clear, there was one additional time.  We had to pay him last week as well.  So now at this point it's four. When the affidavit was written, it was three.

Q    Is it the same amount each time?

A    It varies.  Some of it's paying for food and stuff like that, so it's not going to be the exact same amount.

Q    And how much to date would you say the CS has been paid?

A    I don't recall.  Probably --

Q    Approximately.  We're not going to hold you to it.

A    Let's say $10,000-ish in terms of rent payments over four different times.

Q    A total of --

A    That's an approximation.

Q    Approximately --

A    Yes.

Q    Obviously approximately.  Approximately 10 grand for four different times?

A    That's correct.  That's a guesstimate.

Q    Total?  That's total?

A    That's the total amount, correct.

Q    Okay.

8

A    So, in other words, it's for rent and food and other things.  Again, that could vary.  The last one -- it may be a little higher than that, actually.  So it might be 13 to 15 when you think about four different times.

Q    And with regard to this individual who we're referring to as CS, you noted that there's a -- in the footnote of your affidavit it says:  "The confidential source has been granted a temporary deferred action by the U.S. government."

What is that?

A    Well, a deferred action is essentially they're working with the federal government so they -- he will not be deported.

Q    So he's not going to be deported because he's working for the federal government; is that fair to say?

A    That's fair to say.

Q    And this individual we can assume is from El Salvador; correct?

A    Well --

Q    The confidential source.

A    Do we --

Q    You don't have to tell us where, just that he's from El Salvador.

MR. PATTERSON:  Your Honor, objection.  It's not relevant to a specific country.

THE COURT:  I'll sustain the objection.

MR. PETROVICH:  Your Honor -- okay.

9

BY MR. PETROVICH:

Q    Well, in any case, he faces -- well, all the other individuals with regard to this investigation are from El Salvador; is that fair to say?

A    In this investigation?

Q    Yeah.

A    No.  At least one of them is from Honduras.

Q    One of them is from Honduras?

A    Yes.

Q    But the rest are from El Salvador; correct?

A    That's correct.

Q    All right.  And so --

A    One was -- let me clarify that.  There was one -- I'd have to go through each one individually.  They were El Salvadorians, but we had one that was also born here in the United States.

Q    Oh, fair.

A    So they're citizens.

Q    Very well.  But the others with regard to not being U.S. citizens were from El Salvador; correct?

A    They had El Salvadorian roots, correct.

Q    All right.  So the temporary deferred action means that -- who's authorizing that?  Is that the FBI that's authorizing that?

A    No.  That status would come from DHS.  But to be clear,

10

this is -- that is a new thing.  In the previous investigation, the source was looking for asylum, so he received no benefits whatsoever.  There was no involvement, no deferred action, anything like that.

Q    But now there is; right?

A    At this point, yes.

Q    DHS -- so the U.S. attorney or the FBI contacted DHS and made arrangements so he wouldn't be deported?

A    It comes through -- it comes through the FBI.

Q    I'm sorry?

A    It comes through the FBI.

Q    FBI over to DHS?

A    Correct.

Q    Okay.  All right.  And so that's another very clear benefit, he's not being deported -- and actually, it says here law enforcement is pursuing a visa for CS.  What does that mean?  Does that mean that attorneys are being hired on his behalf?  Or what does that mean?

A    No.  No.  No.  In other words, we would be submitting information based on assistance for a visa for this individual.

Q    So law enforcement, that's FBI, I'm assuming, in this case?

A    Yes.

Q    All right.  So FBI's pursuing a visa for the CS, and he's not being deported; fair to say?

11

A    Yes, that is fair to say.

Q    All right.  And it notes in paragraph 7 of your affidavit all the controlled purchases have been recorded, and the recordings are consistent with the exchanges.

But how were they recorded?  What did you mean by that?  Is that audio or video or both?

A    Both.

Q    Okay.  On all of them, or are some just audio?

A    All of them had audio.

Q    Okay.

A    And then some had video.  There may have been one or two in there that wasn't working or that didn't get actual video that we saw.  But we tried on all of the controlled purchases to get both.

Q    And the audio was on who, the CS?  Was that the source of the microphone and the source of the audio?

A    Yes.

Q    Okay.  And what -- was it just a recorded device that he --

MR. PATTERSON:  Objection, Your Honor.  This goes to source of methods, Your Honor, which is not something that's necessary at this point of the inquiry.

THE COURT:  I'm not sure I heard the full question.

MR. PETROVICH:  I'll move along, Your Honor.  I understand.  I'll move along.

12

Stephanie Austin, RPR, CRR USDC/EDVA

BY MR. PETROVICH:

Q   And I just -- I don't know if I heard the answer.  I think you may have touched on this.  But the CS has no criminal history that you noted; correct?

A   That's correct.

Q   But he's certainly committed illegal acts that the FBI is aware of; correct?  He has committed illegal acts that the FBI is aware of?

A   No.  If you're referring to being here out of status, correct.

Q   No.  I'm referring to other illegal acts as well.

A   We're not aware of other illegal acts conducted.

Q   Not aware of other illegal acts.  Only being present in the United States?

A   Correct.

Q   Okay.  Let me, if I could -- let me go over this generally.

The affidavit that you provided is 26 -- 28 pages long; fair to say?

A   Yes.

Q   Okay.  The allegations against Mr. Romero begin on page 20; is that fair?  20 or 21, somewhere in that range?  Paragraph 53; is that fair to say?

A   Yeah.  It was probably -- well, that was when they met in Arlington, so it would have started -- that controlled purchase

13

would have started before that.

Q    Okay.

A    Yes.  September 22nd.  So it would be page 19, paragraph 47.

Q    All right.  I understand what you're saying.  Okay.

But before that -- so Mr. Romero was not involved in any of the firearms activities; that's fair to say?

A    That's correct.

Q    All right.  And with regard to his alleged involvement, there are two transactions that he's alleged to be involved with; correct?

A    That's correct.

Q    All right.  You earlier described three transactions; fair to say?

A    Yes.

Q    Okay.  The last one was for 4 kilograms; correct?

A    That's correct.

Q    That did not involve Mr. Romero; that's fair to say?

A    That's correct.

Q    All right.  So let's focus on the two that you alleged he was involved in.

The first one was on September 22nd; correct?

A    Correct.

Q    All right.  Now, on that one, the CS, who we had spoken about, and two other co-defendants drove in a Dodge Ram;

14

correct?

A    Correct.

Q    All right.  And they followed a Toyota Tacoma; correct?

A    Correct.

Q    In that Toyota Tacoma, there was a female and a male; correct?

A    Correct.

Q    It's FNU/LNU.  Is -- the male is indicated in the affidavit as, you know, unknown last name, et cetera.

Is that somebody who's cooperating with the FBI?

A    No.

Q    Okay.  Is that someone who's a co-defendant?

A    Yes.  Correct.

Q    Very well.  And so that pairing drove to a gas station outside of -- which I think you put --

MR. PATTERSON:  Objection, Your Honor.  The affidavit has already been accepted here.  It sounds like they're just walking through it.

THE COURT:  It's cross.  Mr. Petrovich can cross.

MR. PETROVICH:  Thank you, Your Honor.

BY MR. PETROVICH:

Q    And those vehicles went and stopped at a gas station across from The Exorcist steps down in D.C.; correct?

A    It wasn't across from it; it was essentially there.

Q    It was right there?  Okay.  Right by The Exorcist steps,

15

which I think is a good landmark.

A    Yes.  Correct.

Q    Okay.  And then once they got there, they interacted with a black male with cornrows who was in a silver Dodge Durango; correct?

A    No.  They did not interact with him.  There was no interaction with him.

Q    No communication, I guess; is that fair to say?

A    That's correct.

Q    Somebody gave a thumbs up, I think?

A    Yep.

Q    Who gave the thumbs up?  Was that the individual with the cornrows --

A    Correct.  Yes.

Q    -- or was that the other one?

He gave a thumbs up?

A    Yep.

Q    And he was in a Dodge Durango; correct?

A    Correct.

Q    Is that individual a cooperating witness?

A    We don't know who that individual is.

Q    You don't know that individual?

A    No.

Q    Okay.  All right.  And then at that point, the CS and the two co-defendants were still in the Dodge Ram; correct?

16

A    That's at the point with the thumbs up gesture, yes.

Q    Okay.  And then two minutes later, a white Mercedes arrived at that same scene; correct?

A    Correct.

Q    The CS gave money to the co-defendant; correct?

A    Correct.

Q    But the CS stayed in that truck, the Ram, I guess it was, the Dodge Ram; correct?

A    Correct.

Q    All right.  And so the co-defendant and LNU got out of the Dodge Ram, and then they interacted with the individual in the Mercedes; correct?

A    Can you repeat that?  Sorry.

Q    It's okay.

        The two -- the co-defendant and LNU --

A    Correct.

Q    -- they got out of the Ram, and they went to the white Mercedes?

A    That's accurate, yes.

Q    And they got inside the white Mercedes?

A    Yes.

Q    Okay.  And they interacted with the individual in the white Mercedes obviously?

A    Correct.

Q    Okay.  Due to the tinting, neither the CS nor agents could

17

see who was in the white Mercedes?

A    Correct.

Q    So no one would be able to identify who was in the white Mercedes as between -- I should say as between the CS and federal law enforcement, no one knew who was inside the white Mercedes?

A    That's accurate, yes.

Q    And also no one identified the license plate on the white Mercedes that arrived there?

A    That's correct.

Q    That's an unknown still?

A    Uh-huh.

Q    All right.  And that was the transaction on September 22nd; correct?

A    Correct.

Q    All right.  And then there was a transaction on October 21st; correct?

A    That's correct.

Q    All right.  This I think -- you may correct me if I'm wrong, but I wrote down paragraphs 59 to 61; does that sound right, approximately?

A    I put it at 58.  Right.  On or about October 21st, 2025.

Q    Very well.  I appreciate that.

         So on that occasion -- let me go back.

         So the first occasion, that was a half a kilogram of

18

cocaine; correct?

A    Correct.

Q    And you said it got field tested, and it was verified to be cocaine?

A    Yes.

Q    All right.  So on October 1st, there was an arrangement -- there were arrangements made for a deal to purchase one full kilogram of cocaine; correct?

A    Yes.  October 21st.

Q    Yeah.  I apologize.  October 21st.  Right.  That's pursuant to the affidavit.

A    Correct.

Q    Okay.  And it was the CS and the same individuals that started the process; correct?

A    That's correct.

Q    But LNU joined the co-defendants in the co-defendant's Dodge Ram; correct?

A    Yes.

Q    So there were the three of them in the Dodge Ram this time; correct?

A    At this point there was four.

Q    There was four.  I apologize.  Four in the Dodge Ram?

A    Yes.

Q    And, again, they went to The Exorcist steps; right?

A    That's correct.

19

Q    The same location where the last one was?

A    Uh-huh.

Q    Was the black male with the cornrows there to meet them on the October 21st deal?

A    So no one saw a black male.  And I just want to clarify, we don't know that they were meeting him, as you said.  It's -- it was just something that was noticed, and we noted it.

Q    Okay.

A    So --

Q    So no one noted it the second time?

A    That's correct.  No one noted it.

Q    But this time there was no white Mercedes; correct?

A    Correct.

Q    This time there was a Volkswagen Tiguan SE; correct?

A    That's correct.

Q    Where were the vehicles oriented as to each other when that deal occurred?

A    That is a very specific question.  I'd have to refer back to the agents that actually saw that.

Q    Can you give me any information as to generally how far apart they were?

A    They were close in proximity based on my understanding, because the individuals in the Dodge Ram got out again and got into the Volkswagen Tiguan.  So it wasn't very far.

Q    LNU and one co-defendant went into the Tiguan?

20

Stephanie Austin, RPR, CRR USDC/EDVA

A    That's correct.

Q    And so CS was in the back of a -- back seat of a Dodge Ram?

A    Front seat.

Q    He was in the front seat.

The CS was riding in the front seat the whole time?

A    Yes.

Q    Okay.  Where was -- where was law enforcement relative to where they were?

A    We had an individual actually located in the -- I mean, they were in that area, the same exact parking lot there by The Exorcist steps.

Q    Were they in vehicles of their own or --

A    Yes.

Q    They were in vehicles of their own.  Okay.

And about how far away were they?

A    Again, I would have to get the exact location, but certainly close enough to be able to put eyes on the vehicle.

Q    Eyes on the vehicle?

A    I'm sorry?

Q    Eyes on the vehicle?

A    Yes.

Q    Okay.  And at this location, what is the lighting like?  Are there lights?  Are there overhead lights?  Are there streetlights there?

21

A   I mean, yeah, there's streetlights in that general area, but it was not an issue given the time of day.  It was still light enough to be able to --

Q   It was still light outside?

A   Yeah.

Q   But law enforcement didn't -- had no way to see who was actually in the Tiguan, who drove the Tiguan; correct?

A   I don't believe we had someone in law enforcement see inside that vehicle.

Q   Okay.  And then after that second, let's call it a deal for one -- the 1 kilogram deal --

A   I'm going to -- if I can retract that.  I'm sorry to interrupt, sir.

Q   Yes, sir.

A   I'm going back now to my affidavit, and we did have surveillance photos of the individuals that were on surveillance, law enforcement, that did actually take pictures of them, and it matched Mr. Romero's DMV photo.

Q   Pictures of -- I'm sorry.  Pictures of what?

A   Of Mr. Romero in the Tiguan.

Q   In the Tiguan?

A   Correct.

Q   Okay.  And then you -- well, in the affidavit it seemed to say that you checked the registration with regard to the Tiguan and it came back to Mr. Romero; correct?

22

A    Yeah.  I said -- I had said -- to be clear, I said -- I had both things in there.  So I noted the surveillance photo also matches Jorge Romero's D.C. DMV photo, and then I would note -- well, that was a Mercedes, but I did also mention the Tiguan that is registered to Mr. Romero.

Q    All right.  But you checked to see who was the registered owner of the Tiguan; correct?

A    That's correct.

Q    All right.  And that came back to Mr. Romero; correct?

A    Correct.

Q    And so after that, after knowing he was the registered owner of the Tiguan, then you went back and showed the photo that you had taken, or a photo to the CS; correct?

A    Correct.

Q    At that point, the CS knew you were looking for that individual because he was the owner of the registered Tiguan; correct?

A    He -- all we did was say was this the guy.

Q    But it was after you had already determined that he was the registered owner of the vehicle?

A    I would have to double-check.  I think what was shown to him -- I don't know the order.  I don't know if we had determined at that point if he was a registered owner or not. We probably had, but I can't say for certain what the order was in terms of when we showed him the picture versus when we

23

identified that he was the owner.

Q    All right.  Very well.

Okay.  And so just to reiterate, neither of the vehicles and Mr. Romero, not associated with any of the firearms deals; fair to say?

A    Yes, that's fair to say.

Q    All right.

MR. PETROVICH:  Your Honor, that's all I have.

THE COURT:  All right.  Thank you.

Anything else for probable cause?

MR. PATTERSON:  Just one quick question.

REDIRECT EXAMINATION

BY MR. PATTERSON:

Q    FNU/LNU, meaning first name unknown/last name unknown was mentioned a number of times.

Has this individual now been identified by law enforcement?

A    That's correct, as of last Wednesday.

Q    And who is this individual?

A    Oscar -- of course I'm drawing a blank on the last name at the moment.

Q    Is this Oscar Raquel Cuellar Macua?

A    Mr. Cuellar, correct.

Q    Thank you.

And did Mr. -- this will be more later, but did

24

Mr. Cuellar make any admissions regarding his involvement with selling cocaine?

A    Yes.  During the interview post Miranda agreeing to testify, he did, yes.  He agreed to setting up the deal.

Q    Thank you.

MR. PATTERSON:  No further questions, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Petrovich, any evidence or argument as to probable cause?

MR. PETROVICH:  No, Your Honor.

THE COURT:  Okay.  I do find there is sufficient probable cause to support the criminal complaint, and we'll continue it for further proceedings.

Anything else with respect to detention?

MR. PETROVICH:  Your Honor, at this point we would reserve on detention.

THE COURT:  Okay.  Reserve in the sense that you want --

MR. PETROVICH:  So we, with the Court's permission, would not argue detention at this point, but reserve that right later -- to be potentially brought up at a later date.

THE COURT:  Okay.  What I'm happy to do is -- what I'll do is I'll just enter an order of detention, but you're free if -- at any time to file a motion to reconsider.

MR. PETROVICH:  Very well.

THE COURT:  If you have a more fleshed out bail package, whatever you want, just file the motion, and I'll make sure it's heard promptly.

MR. PETROVICH:  Very well, Your Honor.

THE COURT:  Okay.  So we'll go ahead and enter an order of detention as to Mr. Romero.

Anything else?

MR. PATTERSON:  No, Your Honor.

THE COURT:  Anything else, Mr. Petrovich?

MR. PETROVICH:  No, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  Have a nice day.

MR. PETROVICH:  Have a good day.

(Proceedings adjourned.)

-----------------------------------

I certify that the foregoing is a true and accurate, to the best of my ability, transcription of proceedings recorded by electronic sound recording (FTR system).

*Stephanie Austin*
_____

Stephanie M. Austin, RPR, CRR

26

Stephanie Austin, RPR, CRR USDC/EDVA