UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

---------------------------x
UNITED STATES OF AMERICA    :    Criminal Action No.:
                            :    1:26-mj-28/1:26-cr-35
     versus                 :
                            :    Wednesday, January 28, 2026
OSCAR VLADIMIR PADILLA       :    Alexandria, Virginia
PORTILLO,                   :
            Defendant.      :    Pages 1-40
---------------------------x

          The above-entitled hearing was heard before the
Honorable William E. Fitzpatrick, United States Magistrate
Judge.

                    A P P E A R A N C E S:

FOR THE GOVERNMENT:    NICHOLAS PATTERSON, ESQUIRE
                       NICHOLAS BOLZMAN, ESQUIRE
                       OFFICE OF THE UNITED STATES ATTORNEY
                       2100 Jamieson Avenue
                       Alexandria, Virginia  22314
                       (703) 299-3700

FOR THE DEFENDANT:     CHARLES DUROSS, IV., ESQUIRE
                       DAVID LINCOLN, ESQUIRE
                       MORRISON & FOERSTER LLP
                       2100 L Street, NW
                       Suite 900
                       Washington, D.C.  20037
                       (202) 887-1500

TRANSCRIBER:           STEPHANIE M. AUSTIN, RPR, CRR
                       Transcriber
                       United States District Court
                       401 Courthouse Square
                       Alexandria, Virginia  22314
                       S.AustinReporting@gmail.com

       (TRANSCRIPT PROCEEDINGS RECORDED BY THE FTR SYSTEM)

                                                            1

TABLE OF CONTENTS

WITNESSES

On behalf of the Government:

IAN MEYERS

Direct examination by Mr. Patterson .......4
Cross-examination by Mr. Duross ...........9
Redirect examination by Mr. Patterson .....24

MISCELLANY

Proceedings January 28, 2026 ..............3
Certificate of Court Reporter ............40

2

Stephanie Austin, RPR, CRR USDC/EDVA

P R O C E E D I N G S:

THE DEPUTY CLERK:  United States v. Oscar Padilla Portillo, Case 1:26-mj-28.

MR. PATTERSON:  Good afternoon, Your Honor.  Nicholas Patterson and Nicholas Bolzman for the United States.

MR. DUROSS:  Good afternoon.  Charles Duross, along with my associate, David Lincoln, on behalf of the defendant, Oscar Portillo, who is present.

THE COURT:  All right.  Good afternoon, gentlemen.

And Special Agent Meyers is still on the stand and has been previously sworn.

And, Mr. Duross, does your client need an interpreter?

MR. DUROSS:  He does not, Your Honor.

THE COURT:  Okay.  All right.  Ma'am, thank you very much.

THE INTERPRETER:  Thank you, Your Honor.

THE COURT:  The two affidavits at issue have been previously admitted.

Do you have any objection to their admissibility?

MR. DUROSS:  No objection with that or to identity, Your Honor.

THE COURT:  Okay.  All right.  So do you have any other questions with respect to probable cause or detention?

MR. PATTERSON:  Not towards probable cause, Your

3

Honor, but towards detention, yes.

THE COURT:  Okay.

Thereupon,

IAN MEYERS,

having been called as a witness on behalf of the government and having been previously sworn by the Deputy Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PATTERSON:

Q    Special Agent Meyers, do you see Mr. Portillo here in the courtroom today?

A    Yes.  Sitting at the front table in the green jumpsuit.

MR. PATTERSON:  All right.  Let the record reflect that Special Agent Meyers --

THE COURT:  It will so reflect.

BY MR. PATTERSON:

Q    And how are you familiar with Mr. Portillo?

A    On January 21st, last Wednesday, we arrested him after a buy bust.

Q    And what kind of vehicle was he driving that day?

A    It's a TRX -- a Dodge Ram TRX.

Q    And how would you describe that vehicle?

A    A very large vehicle, both in size and in weight.

Q    What about in horsepower?

A    Yeah.  It's -- I'm not a huge car guy, but lots of

4

horsepower.

Q   And could you walk us through what happened as the -- as law enforcement tried to arrest Mr. Portillo?

A   Yes.  So basically multiple vehicles, some of which we've already talked about today, were moving away from what we're calling the buy location.  The Dodge Ram TRX also left very quickly, actually ran into an FBI agent vehicle.  That FBI agent vehicle had tried to block his departure, and then that vehicle continued on after hitting that FBI agent vehicle.

The FBI agent turned his -- at that point, he did not have his blue lights on, and then he did turn his blue lights on and followed Mr. Portillo until Mr. Portillo was blocked by a second vehicle.  So from front and behind, which he was stopped, and then he was arrested at that point.

Q   Did Mr. Portillo stop -- so Mr. Portillo hit an FBI vehicle with an FBI agent in it; is that correct?

A   Correct.

Q   But the lights were not on at that time; correct?

A   That's correct.

Q   And then Mr. Portillo, did he stop when the lights went on?

A   No.  He kept going, and, according to the agent, he guessed about 40 miles an hour.

Q   And what kind of neighborhood -- well, what kind of area was this that he was going 40 miles --

5

A    Yeah.  It's a residential neighborhood in D.C.  That's pretty fast for that neighborhood.

Q    And as he's going at a high rate of speed and has the blue lights on from an FBI vehicle, did he stop at that point?

A    No.

Q    And where did -- what happened -- how did he actually end up stopping?

A    Again, it was essentially in traffic and another vehicle -- another FBI vehicle came in and blocked him so that he was not able to get out, is my understanding.

Q    Is there any reason to believe that if he had not been blocked, he would have stopped?

A    I don't believe so, no.

Q    And did -- was the FBI agent who was hit generally okay?

A    Yes.

Q    And did any of the other defendants who were there that day in vehicles drive off and hit any FBI vehicles?

A    No.

Q    Did FBI agents announce who they were when they were trying to stop the defendants?

A    The other defendants -- Mr. Portillo -- I was not there at that location, but, yes, they generally announce "FBI" when you're arresting someone.

Q    Is that standard procedure?

A    That step is standard pressure, yeah.

6

Q    And are you aware of any other defendants who were in vehicles trying to evade capture by law enforcement?

A    No.

Q    And after he was arrested, did Mr. Portillo agree to talk -- speak with law enforcement after being Mirandized?

A    Yes.

Q    And what are some of the statements that Mr. Portillo made?

A    He's just mentioning -- I believe they allowed him a call to what was said to be his girlfriend and he said he was with the FBI and he screwed up.  He basically acknowledged setting up this deal, but that was essentially it.

Q    Was there -- when he called his girlfriend, are you aware of her having any kind of negative reaction to his call?

A    No.  My understanding was from the agents that were -- that actually listened to the call, there was no real surprise or anything in her voice.

Q    Would that, based on your training and experience, indicate that his girlfriend might know about what he's involved with?

A    No surprise --

         MR. DUROSS:  Objection, Your Honor.  Speculation.

         THE COURT:  I'll sustain the objection.

BY MR. PATTERSON:

Q    Did his girlfriend make any indication that she was

7

surprised by what was being said by Mr. Portillo?

A    No.

Q    Thank you.

And did Mr. Portillo make any statements about Ms. Villatoro?

A    Yes.  He made the statement essentially saying that she was like family and was introduced to Mr. Cuellar by way of Ms. Villatoro.

Q    And did he mention involvement in this drug deal?

A    Yes, in this one.

Q    And did he have a money counter in his vehicle with him?

A    Yes.  During the inventory search the money counter was found.

Q    And did he have bands for cash that are consistent with the cash that was used for the buy money?

A    Yes.

Q    Was the buy money found in his vehicle?

A    No.

Q    Is there any indication why that might be?

A    It's possible -- it's likely the second individual was in that vehicle and took the cash.

Q    Thank you.

MR. PATTERSON:  Your Honor, I have no further questions.

THE COURT:  Mr. Duross.

8

MR. DUROSS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DUROSS:

Q    Last, but not least.  You've been on the stand for a long time, so I appreciate your patience.

So you're familiar with the affidavit in this case; I think you have it in front of you?

A    Uh-huh.

Q    And I'm not going to belabor this thing, I know we've gone through it a bunch of times.  Let me kind of quickly cover a couple of things.

There were, and as previously discussed in other hearings already, sort of controlled buys on I think it was September 22nd of 2025, October 21st, 2025 and December 11th, 2025; correct?

A    That's correct.

Q    All right.  And in those different controlled buys in September, October and December, there was either cocaine or crack or firearms or both for the subject of those purchases?

A    That's correct.

Q    And those involved this CS that we talked about before?

A    Uh-huh.  That's correct.

Q    With regard to the September, October and December controlled purchases involving the CS, Mr. Portillo was not involved in any of those transactions?

9

Stephanie Austin, RPR, CRR USDC/EDVA

A    Not to my knowledge, no.

Q    Okay.  And -- but with regard to the CS, is he working on an S visa?  He's trying to get an S visa, is that what's going on?

A    Yes.  He's trying to get a visa, yes.

Q    And it sounded from what I heard that he had pursued asylum, but that was denied?

A    It was not denied.  I don't think that was the language. It was just -- it got held up.  It was -- I don't believe it was denied.

Q    Okay.  I just want to make sure there wasn't some adverse credibility finding --

A    No.

Q    -- about that particular CS.

A    No.  Nothing like that, no.

Q    All right.  And I think you said earlier the investigation began sometime in the summer of 2024?

A    That's correct.

Q    And the first time you came across Mr. Portillo was last week?

A    That's correct.

Q    Okay.  Now, I want to turn to January 21st, 2026, the topic you were just speaking with Mr. Patterson about.  And that was I think, as you described it earlier, the buy bust.

A    Uh-huh.

10

Stephanie Austin, RPR, CRR USDC/EDVA

Q    So focusing on the buy bust, I think you had I think Mr. Zepeda or Zepeda, I'm not sure quite how to pronounce that.

A    I know who you're talking about, yeah.

Q    I'm from Kalamazoo; I don't speak Spanish either.

A    I get it.

Q    And then I think it was Ms. Romero?

A    Correct.  She was there at that time.

Q    Mr. Cuellar?

A    Correct.

Q    And Ms. Villatoro?

A    Correct.

Q    And those four people were involved at different times in different ways in some of those prior controlled purchases that you were -- we were talking about a moment ago?

A    That's correct.

Q    Okay.  So let's talk -- I think it is -- paragraph 35 is where it starts to talk about January 21st, page 13 of the affidavit, just so we can all kind of follow along.

That paragraph, I think it is first in paragraph 37, that's the first substantive reference in the entire affidavit that has anything to do with Mr. Portillo; is that fair?  I just want to make sure I didn't miss anything.

A    Let me just double-check, but I believe that's accurate. Yeah, that would make sense.  Correct.

Q    Okay.  And then the next paragraph, paragraph 38, you talk

11

Stephanie Austin, RPR, CRR USDC/EDVA

about that law enforcement moved in on the scene after the controlled purchase, which you were talking about before, in a parking lot near 1850 U Street; is that right?

A    Uh-huh, that's correct.

Q    All right.  Now, Mr. Patterson was just asking you about sort of what happened at the time that the FBI tried to arrest people in the wake of the buy bust --

A    Uh-huh.

Q    -- so the bust part of the buy.

And so if I understand it correctly, I just want to make sure I'm clear and the Court's clear, there were two different locations at the end of the day where people were taken into custody; correct?

A    I mean, it was all right on the street.  Yes.  I'm sorry.  Yes.  Mr. Portillo was in a different location, that's correct.

Q    So I just want to make sure that I understand and the Court understands kind of what you were able to see and what your vantage was.

As I understand it, there was an alleyway or some area kind of between buildings.  Two of those vehicles we were talking about before, the Ram followed by the Toyota --

A    Takoma.

Q    -- Takoma -- I'm not a car guy necessarily, at least not unless it's GM.

And so it pulls out and they go out on the street and

12

then they're stopped?

A    Correct.

Q    Separately, because they had gotten into those vehicles and they were leaving; correct?

A    That's correct.

Q    And then the TRX, the Ram vehicle they said Mr. Portillo was in, that was in the alleyway and went out a different way?

A    That is my understanding based on my discussions with other agents, yes.

Q    And so I just wanted to ask, where were you?

A    I was -- I was just in the area on the radio.  I didn't witness those incidents.

Q    Okay.  Got it.

So I just want to walk through kind of what I understand kind of happened.

The FBI vehicles that we are talking about, none of them were actually marked; right?  It's not like a police car. The unmarked -- I don't if you want to call it that, but they don't have markings on them?

A    Unmarked is a fair word, that's correct.

Q    And regardless of whether the lights were on or off, there isn't like a big like emergency light bar or light bar at the top of the car like you would see on a police car, like maybe a state police where you have like a big thing you could see on the top, that's not what these vehicles were like?

13

A    No.

Q    All right.  Now, I want to make sure I understood exactly what you were saying about the collision between the FBI vehicle and the TRX.

This all happens relatively quickly; fair?

A    That's fair, yeah.

Q    We're talking about like minutes, maybe even sort of less, seconds, very quick?

A    Sure.  Very quickly.

Q    And as the TRX is leaving this sort of alleyway or area between the buildings, the FBI vehicle you said comes up to try to block in the TRX?

A    Correct.

Q    And I know that the affidavit describes it as ramming, and I think you had said ran into the FBI vehicle.

Was it -- I just want to be clear and kind of fair about what's going on.  The FBI vehicle was coming up and the TRX is coming up, and who hit who?  I want to kind of make sure I understand.  Like, there's an effort to -- you weren't there in the beginning --

A    Again, I wasn't there; I'm simply relying on what I was told that they tried to block and Mr. Portillo again hit their vehicle.

Q    Okay.  Or it could be that, from his vantage, they hit his vehicle?

14

A    I couldn't say that.  I mean, again, they were there to block.  Mr. Portillo was, again, to my knowledge, involved in a 4-kilogram cocaine deal, so it would stand to reason that he was fleeing, leaving and running into that vehicle, so I didn't ask as to how else they could have perceived it.

Q    Understood.

And I think you said, and I appreciate, there were no lights on at that moment --

A    At that point, there was not --

Q    -- in the vehicle?

A    -- correct.

Q    And in fairness, to be clear, this is all happening very quickly --

A    Yes.

Q    -- the agent's pulling up, whoever that is, to block the departure of this vehicle, and hasn't hit the lights on.  I just want to be clear, no criticism.

A    No.

Q    But I'm just saying, there weren't lights and it was an unmarked vehicle?

A    That is correct.

Q    Okay.  And so I take your point that you -- sort of the aside.  There were 4 kilos, and I assume he's fleeing law enforcement.  I get that.

This is a somewhat bad neighborhood; fair?

15

A     That's fair.

Q     In fact, I think in the past year, there have been 14 cars that have been stolen within sort of a three- or four-block radius within this location?

A     I don't know.  I'm not sure.

Q     Five robberies?

A     Again --

Q     No idea?

A     -- I don't have all these details, but I know the neighborhood is not -- there's -- it's a high-crime neighborhood.

Q     The majority of which are armed robberies, it wouldn't surprise you?

A     It would not surprise me.

MR. PATTERSON:  Objection, Your Honor.  Speculation.

THE COURT:  He can answer if he knows.  He's testified that he knows it to be a high-crime area.  I think that ...

BY MR. DUROSS:

Q     And so, 4 kilos in the car, people are jumping out, there's a lot of hectic things going on.  And let's assume -- let's grant that there were 4 kilos in there, I heard you earlier say, they were ultimately seized, tested positive for the presence of cocaine.

You could almost get robbed with cocaine; right?

16

A     You're asking if you could get robbed having cocaine?

Q     You could got robbed?

A     Sure.  Yes.

Q     And also I think it was $88,000 in cash?

A     Yes.  It was 88.  Yep.

Q     Okay.  And in terms of what actually happened after the collision between the FBI vehicle and the ultimate stop, I believe you said a couple of times sort of my understanding.

      You weren't there, and you didn't witness that?

A     That's correct.

Q     And so whether or not Mr. Portillo, for example, ultimately looked in the rear-view mirror, saw the lights and stopped, versus whether there was a car that blocked him in, he ultimately stopped, you're relying on other people, not your own sort of personal view -- personal vantage to see what happened?

A     Yeah.  I mean, I can't speculate as to what he saw in the rear-view mirror or not.

Q     Right.

A     But yes.  What I'm saying is what I've heard from the other agent that was following him and that was hit by the vehicle.

Q     Understood.

      I heard Mr. Patterson early on say, and I think, in fact, it was actually during the testimony during

17

Ms. Villatoro's case.  He said that Mr. Portillo sold 4 kilos. And I heard very clearly, because I started to listen, you responded differently than that.  And your response to the question that he sold 4 kilos was -- I wrote it down -- he was in the vehicle in which the 4 kilos were located and ultimately --

A    Yes, that's accurate.

Q    Okay.  Mr. Portillo exited the vehicle and was cuffed, I assume, taken into custody on the scene?

A    Yes.

Q    As far as you know, he was not Mirandized at the scene?

A    Yeah.  I mean, as far as I know, I don't think he was Mirandized at the scene.

Q    Now, Mr. Patterson asked you some questions about what he said post Miranda; do you recall that?

A    Yes.

Q    Okay.  I want to talk to you about what happened pre Miranda.

Was he questioned by FBI agents not just about booking questions -- I get date of birth, address, whatever. Was he questioned as to any questions that were substantive about the matter pre Miranda?

A    I wasn't there.  I can't speak to that.  I would assume not, he should be Mirandized, but I can't speak to that.

Q    Because that would be FBI policy that before asking

18

questions that are substantive in nature, not necessarily a booking question, but substantive in nature, there's an FBI policy that he should be Mirandized before that?

A    Yes.

Q    So if he was questioned in any way that is substantive before Miranda, that would be a violation of FBI policy?

A    Yes.  Generally speaking, yes.

Q    And let me ask you a few other questions.

It sounds like you -- were you there when he was questioned?

A    No, I was not.  I was in the building, but I was not there when he was questioned.

Q    Fair point.  I asked a bad question.

So did you participate in the questioning of Mr. Portillo?

A    No.  No, I did not.

Q    Okay.  And how many agents were involved?

A    Two.

Q    Okay.  And do you know after -- well -- so you don't know whether they questioned him before.

Do you know whether after he was Mirandized whether there was a break in the questioning?

A    I don't know the answer to that.

Q    Do you know whether or not different agents then started to question him that weren't the ones that were talking to him

19

before he was Mirandized?

A    I don't know.

Q    Do you know if anybody indicated to him that this questioning post Miranda would be questioning that was anew, it was new questioning?

A    I don't know.  I mean -- yeah, I don't know the answer to that.

Q    Or that any -- if there were, if there had been any questions of him that were substantive in nature pre Miranda, that those wouldn't likely be admissible at a criminal trial, but anything post Miranda would be?

A    That's my understanding of the law, yep.

Q    Right.  No, my point was, was he informed that if he had made any statements in response to substantive questions before being Mirandized, that those likely would not be admissible, but any questions post Miranda would be?

A    I don't know what they said to him.

Q    Okay.  I think you said earlier it was videotaped?

A    Yes.

Q    And I just want to make sure I understand.

     Videotaped post Miranda, but also the entire time that he may be in the room being questioned?

A    I believe so.  I believe so.

Q    Okay.  And I assume the agents would have taken notes of any questions of him?

20

A    Yeah.  I presume, yes.

Q    And those notes itself in addition to 302 would be preserved?

A    Correct.

Q    Would they indicate in the 302 if there were any questions asked pre Miranda versus post Miranda?

A    It depends how the agent wrote the notes, the 302 itself.

Q    Okay.  I want to turn to a couple of other things.

My understanding is there were no drugs found in Mr. Portillo's vehicle after he was arrested?

A    That's correct.

Q    And no firearms?

A    That's correct.

Q    And the money is missing?

A    Correct.

Q    And the bands I think Mr. Patterson said were found on the driver's seat, consistent with the bands I think of the money, which was government money.  So you guys knew what the bands looked like.  And they were on the driver's seat?

A    Very consistent.  Yes.  On the driver's seat.

Q    And to be clear, neither you nor any FBI agent nor the CS were in that vehicle during the exchange with the 4 kilos and the cash?

A    That's correct.  None of us were in there.

Q    Just making sure I wasn't missing anything.

21

And so in terms of -- in terms of what we see, the 4 -- the $88,000 in cash goes from one vehicle of people over to the TRX, they go inside, and then they leave with 4 kilos and then kind of all hell breaks loose with the buy bust and the takedown?

A    Yeah.  Generally that's what it --

Q    Okay.  So who was handling the money, who was handling the drugs, and who was using sort of the money counter or undoing the bands, all of that you wouldn't know?

A    Correct.  I mean, this is still part of the investigation. It's an ongoing investigation.  We're still putting stuff together.

Q    Totally fair.

A    It's a couple days ago, so we're still --

Q    I hear you.  I hear you.  I appreciate it.  I was just trying to make sure what we knew actually had happened about sort of it involving -- and frankly, it's really more about relative culpability.

Before arresting Mr. Portillo, did you know his identity?

A    No.

Q    There was some discussion between you and Mr. Patterson about a phone call that he was permitted to make to his girlfriend or long-time partner, and there was some back-and-forth about whether or not she acted surprised; do you

22

recall that?

A    Uh-huh.

Q    And so I think what you had said to Mr. Patterson, and I want to be clear on it, is that she didn't seem surprised; was that right?  Or was not surprised; is that it?

A    Correct.  Based on what I was told by the agent, she didn't seem surprised.

Q    Okay.  So you heard from an agent who was listening to a call that was on a speakerphone that he was making to somebody else, and that was the ultimate sort of take-away?

A    That was my understanding, yes.

Q    Okay.  But you don't know whether his long-term girlfriend -- or you're not suggesting to this Court that she's a co-conspirator?  Do you know that?

A    I'm not suggesting any of that.  I'm simply saying what the agent told me, was it didn't seem that there was -- that they, that the individual on the other end of the phone, was surprised at all when he told her that he was with the FBI.

Q    I hear you.  It's kind of hard to make an assessment about what was going at a moment; right?

A    I mean, not necessarily.  They're FBI agents; I trust their judgment.  Like, they can determine whether they hear a surprise in someone's voice when they say the FBI is calling.

Q    You can be completely stunned and in shock, right and not say --

23

A     Anything is possible.

MR. PATTERSON:  Asked and answered at this point.

MR. DUROSS:  I didn't raise this, Your Honor.  I'm just trying to make sure we're clear about what the actual evidence is here.

THE COURT:  I think he's still -- we're still there.  Go ahead.

BY MR. DUROSS:

Q     You can be shocked in silence; right?

A     I suppose, yes.

Q     And --

MR. DUROSS:  I think that's it, Your Honor.  Thank you.

THE COURT:  All right.

MR. DUROSS:  And thank you for your patience.  I know you've been on the stand all day.

THE WITNESS:  Thank you.

REDIRECT EXAMINATION

BY MR. PATTERSON:

Q     Did Mr. Portillo mention why he brought a money counter to the drug deal?

A     I would have to check the notes on that.

Q     Okay.  You mentioned the neighborhood that this was in.

Does Mr. Portillo own a property near the buy location?

24

A    Yes.

Q    And how do you know that?

A    We actually, after the investigation -- or after the arrest, there was a slip of paper that one of the agents saw that was actually inside the TRX and it had the address.

Q    And do you have reason to believe that this is a multiunit dwelling?

A    Yes.

Q    And did Mr. Portillo discuss owning commercial property?

A    Yes, with the agents.

Q    What did he say about commercial property?

A    Just that he owned the building.  Again, I would have to check the 302 notes.  I apologize.

Q    Did he say if he owned multiple commercial properties?

A    He did say that he owned a couple buildings, I think is the way he said it.

MR. PATTERSON:  Thank you.  I have no further questions.

THE COURT:  All right.  Mr. Duross, I think finally the agent can step down.

MR. DUROSS:  I think he can.

THE COURT:  Thank you very much, Special Agent.

THE WITNESS:  Thank you.

THE COURT:  Mr. Duross, any evidence or argument as to probable cause?

25

MR. DUROSS:  Your Honor, the only thing I would say, really not an argument about probable cause, but I think it's really more relevant for pretrial detention, which is whether or not with regard to this particular defendant, the presumption applies.  It's an 846 case under 841, I get that part, but he only showed up at the very end.  He was in a vehicle that had 4 kilos.  I understand that broader conspiracy is above the 5-kilo minimum, and I understand, like, what the case law is on this, which is, you know, personal involvement, so that's only 4, and then reasonable foreseeability.

I don't know that we're there.  There's still probable cause.  You're not going to get an argument from me on the 846 and the 841, but when we're talking about whether there's a presumption and what component of the statute we're in, whether it's actually 841(a)(1)(B) for 500 grams, I think we're actually in that neighborhood, but I don't -- but it's not about probable cause; it's about, at the end of the day, what's probably more relevant for the pretrial detention because it impacts the sentencing disclosure.

THE COURT:  I get it.  I think that -- and I appreciate your argument, and that's a good argument.  I think that -- and the reason why -- one of the reasons why I think we have to do probable cause before we do detention is whether or not the government has established probable cause that the conspiracy itself, you know, fell to a (b)(1)(A) category.  And

26

if it does, I think the presumption attaches to all defendants properly charged under that 846 theory. And I do think that the government has established probable cause, not only of the existence of the conspiracy, but the quantity of drugs properly attributable to the conspiracy.

So I do think that -- take your point and it's a good argument, but I think that -- I think that the binding case law is that -- is that I do have to consider that the presumption attaches to Mr. Portillo.

MR. DUROSS: 100 percent understand and prepared to address that and rebut it.

THE COURT: All right. Thanks.

MR. DUROSS: Thank you, Your Honor.

THE COURT: Any other evidence or argument as to detention?

MR. PATTERSON: Argument for detention, yes, Your Honor.

THE COURT: Okay.

MR. PATTERSON: Your Honor, the government would ask for Mr. Portillo Padilla to be detained based on both danger to the community and risk of flight.

After being involved in selling approximately 4 kilograms of cocaine, Mr. Portillo, when encountered by law enforcement, drove away at great speed. None of these other defendants did this.

27

In the process of driving his three-ton-plus truck, Mr. Portillo rammed an FBI vehicle containing an FBI agent. The government is looking at the possibility of charging him for assault on a federal agent based on this. Even if this had not been a federal agent, he still rammed a vehicle in an attempt to escape from law enforcement.

Further, he continued to flee even while pursued by law enforcement with flashing lights. Mr. Portillo was only apprehended after being boxed in. All of this happened at a high rate of speed in a residential neighborhood in Washington, D.C.

If there hadn't been -- if he hadn't been boxed in, he might have gotten away. He put others in danger in the process. He put the FBI agent, whom he hit, in danger. He also put other people in the neighborhood in danger. When he was stopped, he had bands for the buy money and a money counter.

Further, Mr. Portillo's building address, which he did not report to probation, he only reported his residential address to probation. He did not, as far as the government's aware, report multiple commercial buildings as assets to probation -- to Pretrial Services. This was the address where the other co-conspirators were told to go for the deal. The deal took place outside of his building. The amount of drugs he sold is also a danger to the community given the large

28

amount and his expectation that he was going to --

THE COURT:  You say outside his building.  Outside of which building?  His residence or his -- or the building he owned?

MR. PATTERSON:  A building that he owned, Your Honor.

THE COURT:  And you've confirmed that?

MR. PATTERSON:  Yes, Your Honor.  I can bring Special Agent Meyers back to the stand, Your Honor.

MR. DUROSS:  No objection, Your Honor, that --

THE COURT:  I'll take your proffer.

MR. PATTERSON:  And this is a building he did not report to Pretrial Services, Your Honor.

THE COURT:  Okay.

MR. PATTERSON:  The amount of drugs he sold is also a danger to the community, given the large amount and his expectation that there was going to be a large amount because he needed a money counter to keep track of the buy money.

In terms of his custodian, his girlfriend, this appears to be the same girlfriend whom he called on the phone and who was not surprised that he had been arrested by the FBI. This indicates that she knows of what he was involved in, that she would not be a good third-party or appropriate third-party custodian.

In terms of flight risk, he did not submit to law enforcement; instead, he violently tried to elude law

29

enforcement.  He faces a mandatory minimum of ten years and up to life, and he may be charged with assaulting an FBI agent, all of which would give plenty of reasons to run.

Additionally, he was born in the United States, but his family is in El Salvador, but, although he admitted this to probation, he -- to pretrial, he wouldn't tell pretrial where in El Salvador or any information about where his parents live in El Salvador.

I've already mentioned the part about his not being truthful or fully truthful on his financial statement, Your Honor.

For all these reasons, the government would ask for him to be detained as a danger to the community and a risk of flight.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Duross.

MR. DUROSS:  Thank you, Your Honor.

Assuming that the statutory presumption applies, I believe at the end of the day what we are going to be able to do, Your Honor, is to rebut that presumption.  Let me speak to a couple of different issues and address Mr. Patterson's representation to the Court.

First, in terms of nature and circumstances of the offense, there is no doubt that this is a serious case, regardless of whether it's 4 kilos is more than 5 kilos.  It's

30

a lot of cocaine.  No doubt.  Very serious.  And the allegations, no doubt, is also about what Mr. Portillo did in the moments after sort of the controlled buy are important.  I think the context matters there.  I think the Court had already sort of picked up on what I was laying down, which is this is a bad neighborhood, there's good reason to be concerned about whether he might get robbed if you're involved in the alleged conduct, which is cocaine and a lot of cash, in that particular neighborhood.  The vehicle wasn't marked, the lights weren't on.  And this particular witness, I did not take from his testimony -- no offense to him, he wasn't there -- that Mr. Portillo didn't stop -- this is within moments of this occurring -- stopped and then was taken into custody.

And, look, we can talk about whether he rammed that vehicle or was trying to get away or not, but at the end of the day, in terms of the -- like, once you move past the nature and circumstances of the offense, I believe that there's a combination of conditions that can assure his attendance at trial.

First, in terms of the weight of the evidence, as I've already indicated, Your Honor, he was involved at the very, very, very end of this matter.  There's a reason why we're probably the last ones standing in your courtroom right now, which is he was the last person to show up.  He was the driver of the vehicle, as the agent was quite clear to say.  He

31

was the driver of the vehicle.  There is not evidence that he was the one that brought 4 kilos to that deal or ran off with $88,000.  There are other people that were in that vehicle.  He was the driver, that's what we've established.

And in terms of your Court's assessment of whether there's probable cause, yes, like, there's more than enough circumstantial evidence based on that that just being the driver is enough.  But in terms of the actual weight and the role that he played, I think it does matter.

And when I think about sentencing exposure and we talk about a ten-year-to-life mandatory minimum, I do think that there's the possibility for safety valve.  Obviously depending on what the government ends up deciding to do, I understand that.  If he does qualify for safety valve, you know, potentially if I were able to convince a thoughtful judge about the application of minor or minimal role in a circumstance of this nature, ultimately we're not talking about a ten-year mandatory minimum; we're actually talking about something more in the nature of 30 to, you know, 40 months, something along those lines.

He does have one prior, Your Honor, that I wanted to point out.  It's not a prior felony.  It happened in 2016, it's reflected in that report.  He had bond in that case, he showed up for all hearings, and he got probation and successfully completed probation in that matter.  So while it's not a great

32

thing that we're even before Your Honor with a prior, it was a misdemeanor, and he showed up to court as he said he would, and he successfully completed probation.

As I sort of look at the personal history and characteristics of this particular defendant, Your Honor, he is a U.S. citizen, he has lived in his area for most of his life. You know, he resides in P.G. County with his common-law wife or long-term partner or girlfriend or however you want to refer to it for at least 14 years. And Carla is here in the courtroom. She is the mother of his three children. They are eight, four and three months.

UNIDENTIFIED SPEAKER: He's four months today.

MR. DUROSS: Four months today. So eight, four and four months.

So he has not just ties to this community; he has significant ties to this community, Your Honor. And that is what -- when you're thinking about rebuttable presumption, what could rebut that? You look at the personal history and characteristics under 3142. He is the sole financial provider for the family. He does have rental properties, I've discussed that with him, and we're here and prepared today to talk in more detail about that. It's a little complicated. You have some rental properties, you have some commercial properties, including the one located near this deal. And so he does have a business. He's also a contractor.

33

He currently has two different significant projects ongoing in Suitland and Potomac. He's got a roof that's not on one of the buildings that they tarped up in the last few days. And he, you know, as part of his business, he employs a number of people to do this. So he has financial ties, he has a stable business and employment. He has a wife, got three kids, lots of family. Uncles, aunts, cousins. I don't know how many people -- if everyone here for him could stand up for just a second and give the Court a sense of the support he has in this community.

Thank you very much.

Friends, cousins, uncles, he has business people that he works with. Legitimate business people he works with are all here, and they have come, and they've spent hours in this courtroom to convey to Your Honor the support that they have for him and what they would be willing to do to support him.

I understand the seriousness of the allegations that Mr. Patterson has raised, and there's no doubt that those are serious, but when we're asking if he is going to be likely to flee when his entire life is here in this community, I don't think he's a risk of flight.

His parents do live in El Salvador. It was not part of the conversation with PTS -- Pretrial Services, sorry, about this, but he's gone to visit them a few times. We've brought his passport here. He's gone to El Salvador a few times. It's

34

all reflected here.  The last time he went was in 2024.  He'll turn that in to probation.  So I think that he is not a risk of flight.

This is a serious case, but once you look past the statutory minimums and look at what this might result in, I think ultimately he is not somebody that has a risk of flight.  He understands the serious situation that he is in, and he needs to deal with it.

Let me address -- and, by the way, I'll just say with regard to Carla, I just don't think that the Court can really speculate as to sort of what's going on and make any kind of conclusions about that.  I just -- I get what Mr. Patterson is saying.

THE COURT:  I'm not concerned about that conversation.

MR. DUROSS:  But I just -- I don't think that she is a risky person that he could go live with in the home that they've now resided in for years in the same location.

Your Honor, in terms of danger to the community, he does not have, if the Court look at his criminal record, a history of violence.  Like, I hear what happened with the truck and what happened and we can debate about what was going on, but ultimately he stopped.  Whether you want to say he was stopped or he stopped, he did stop.

Nobody found any firearms on him.  He is not involved

35

in any of the firearms transactions.  And this is a very serious case, as Your Honor indicated earlier.  He raises his kids, they're young, he takes them to sporting events and school events.  You know, he is a person that is actually a part of the community, not a danger to it.  And I would suggest to Your Honor that there are a combination of conditions that could reasonably assure his attendance at all proceedings in this matter and that would also protect the community given sort of his relatively -- relative culpability in this matter.  And so with probation in terms of the Pretrial Services report, they have recommended that he get personal recognizance.

There is more to talk about in terms of some of the financial component of it.  He does have a couple of rental properties.  I will tell you with regard to -- he had three what I would call multifamily properties, one of which was recently foreclosed on.  So I do think that he has some struggles in terms of the financials.  But, yeah, I don't want to provide a motive to the government on this matter, but there's certainly those issues.  He has a couple of rental homes.  He has some equity in them, but it's not liquid.  I think that's probably why I'm standing here in front of Your Honor.  He does have a home on Jennings Lane in Bowie, Maryland.  They have about $165,000 in equity in the home.  And he does have equity in a couple of the other rental homes.

The commercial properties are a bit more complicated,

36

Your Honor.  I'm not a transactions guy, but what I will say is that there are two 6-unit properties.  They're held in the name of an LLC.  I don't know if that may have been the communication or the confusion with regard to Pretrial Services as to what assets and the like.

As I understand it, they are currently not paying the mortgage on either of those commercial properties, so I do think that they may ultimately be subject to forfeiture as well.  Not forfeiture.  That would be Mr. Patterson's decision on all of that.  Subject to foreclosure.  But, you know -- and I don't know about the equity in those and whether there may be sort of other investors.  And I would suspect it would be difficult to have something encumbered on that.  I just don't know what the mortgage documents look like, but that's where we -- that's where we currently are.

I don't think that he was misleading Pretrial Services.  That would be serious.  He knew and I knew that I was going to be coming to talk to you about all of these issues, and I think he's been transparent with me.

I've been going on too long, it's late.  My apologies, Your Honor.

THE COURT:  Not at all.  And, Mr. Duross, I think you've certainly marshaled every argument you possibly could.  I just -- there are -- the concerns that I have are these:

First, obviously, a substantive transaction of

37

4 kilograms of cocaine is a significant, significant drug transaction, and -- just standing alone regardless of any presumption that would attach.

To your point about the fact that the role that he played in this, was he simply a driver. You just don't see many simple drivers who have a net worth of approaching three-quarters of a million dollars. Right. Normally they are minions, they are workers, and they are low-level people within the construct of a drug trafficking conspiracy.

So I'm not sure the evidence right now -- and this is obviously not a trial, and issues of fact in dispute will be resolved by other judges or juries at some point in the future, but I'm not prepared at this point to say that he played a -- such a low-level role as simply to be a driver taking drugs or a person from Point A to Point B.

MR. DUROSS: Your Honor, if I may. And I apologize.

THE COURT: Sure. No. Please.

MR. DUROSS: But Ms. Villatoro, who was just in front of Your Honor, was involved in more transactions, including the one involving 4 kilos. She was driving a vehicle Your Honor found with sort of a location device and the like that she ultimately could be someone that could be trusted to be released pretrial. I would ask Your Honor just to consider whether that might be a possibility here.

THE COURT: I appreciate that, but I do think the

38

Stephanie Austin, RPR, CRR USDC/EDVA

cases are materially different.  I mean, Ms. Villatoro, you know, seems to me really was a follower, not a leader of this. I think the evidence was -- at least at this stage, I think that's the way it played out to me.

Mr. Portillo sort of had the -- has both the financial help and the instruments to show that -- that -- to suggest that it really is a major drug trafficking operation. There aren't many people who drive around with money counters at a drug deal, from a drug deal.

MR. DUROSS:  Your Honor, it was -- Court's indulgence.

So he is someone who is struggling financially.  He has matters going into foreclosure, he's not being able to pay off the mortgages, which I would suggest, Your Honor, may also be an equally explainable reason why he may have found himself in a vehicle as part of a transaction in which he had nothing to do with either getting the money or procuring the drugs and bringing sort of his cocaine.  He has a money counter, he collects rent from a variety of people as part of his business, and he's a contractor.  So --

THE COURT:  But I can't ignore the fact that this happened, you know, after a hand-to-hand drug transaction in which 4 kilos of cocaine were exchanged for $88,000.  $88,000 in which somebody, somehow was able to escape with.

But I think most compelling, quite frankly, is the

39

fact that he did try to escape. And I take your point, you know, when he rammed that car maybe he didn't know if he was being robbed or arrested. At the end of the day, I'm not totally sure it matters because, you know, once he got past the first car and he was willing to strike that car, he was willing to push through it, whatever he did, it was clear that law enforcement did activate their emergency equipment. And he didn't surrender right then, he didn't stop right then. The clear evidence before me is that there was some period of time where there was no doubt, reasonable or otherwise, that there was law enforcement pursuing him after this drug transaction and he attempted to escape and he was just unable to escape. And I think that is a compelling fact that really requires detention.

So I do find that the government has satisfied its burden on both prongs, on both danger to the community and risk of flight. You know, I'll order Mr. Portillo detained pending trial.

MR. DUROSS: Thank you, Your Honor.

(Proceedings adjourned.)

----------------------------------

I certify that the foregoing is a true and accurate, to the best of my ability, transcription of proceedings recorded by electronic sound recording (FTR system).

*Stephanie Austin*

Stephanie M. Austin, RPR, CRR

40